# 2004 DTA 114

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**REGION JUDICIAL DE SAN JUAN**
**PANEL III**

RINGLING BROS. AND BARNUM & BAILEY COMBINED SHOWS, INC.
H/N/C WALT DISNEY´S WORLD ON ICE
Demandante-Apelante

v.

SECRETARIO DEL DEPARTAMENTO DE HACIENDA DEL ESTADO
LIBRE ASOCIADO DE PUERTO RICO
Demandado-Apelado

Núm. KLAN-02-01410

San Juan, Puerto Rico, a 4 de junio de 2004

Panel integrado por su Presidente, el Juez Rafael Ortiz Carrión,
y los Jueces Antonio J. Negroni Cintrón y Jorge Segarra Olivero

Negroni Cintrón, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Ringling Bros. Barnum & Bailey Combined Shows, Inc. (Ringling) apela la Sentencia emitida el 1 de julio de 2002 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), en los casos Civil Núms. KC094-0030 y KC097-0029, que promoviera contra el Secretario de Hacienda del Estado Libre Asociado de Puerto Rico (Secretario) reclamando el reintegro de ciertos arbitrios que había satisfecho bajo protesta.

Mediante el dictamen apelado, el TPI denegó las reclamaciones de Ringling, al resolver que éste no había demostrado que tenía derecho a la exención de arbitrios a que tienen derecho los espectáculos artísticos o teatrales.

Con el beneficio del alegato del Secretario, la transcripción de la evidencia oral desfilada durante el juicio en su fondo y demás prueba documental y objetiva, resolvemos. ■ De rigor es señalar que nuestra función revisora no es evaluar totalmente la controversia, sino revisar la sentencia apelada a la luz de los errores específicos planteados.

## I

El trasfondo fáctico y procesal de la controversia no está en disputa. El mismo surge claramente de las siguientes determinaciones de hechos formuladas por el TPI en su sentencia:

*"1. Ringling Bros. es una corporación organizada bajo las leyes del Estado de Delaware, Estados Unidos de América, debidamente autorizada a efectuar negocios en Puerto Rico. (Hecho estipulado).*

*2. Desde 1987 hasta el presente, Ringling Bros. viene presentando en Puerto Rico espectáculos de patinaje*

*sobre hielo. (Hecho estipulado).*

*3. Desde 1987 hasta el 1993, ambos inclusive, Ringling Bros. le solicitó y el Secretario de Hacienda le reconoció una exención sobre los derechos de admisión a sus espectáculos públicos al amparo de la exención dispuesta en la sección 4.004 (c)(10) de la Ley de Arbitrios de 1987, 13 L.P.R.A. sec 7154(c)(10). (Hecho estipulado).*

*4. El Departamento de Hacienda no le cobró arbitrios a Ringling Bros. durante los años 1987 al 1993 a tenor con la sección 4.001 de la Ley de Arbitrios de Puerto Rico, según surge de los respectivos formularios, Modelo SC 2049 "Relación de Boletos Refrendados". (Hecho estipulado).*

*5. Para el año 1994, el Secretario de Hacienda le denegó a Ringling Bros. la exención solicitada para el espectáculo público a presentarse en dicho año, "Walt Disney's World On Ice Mickey's Great Adventure". (Hecho estipulado).*

*6. El 25 de abril de 1994, Ringling Bros. declaró y pagó bajo protesta la cantidad de $110,585.71, por concepto de arbitrios sobre derechos de admisión a espectáculos públicos, según surge de la declaración de arbitrios núm. 443507 del Departamento de Hacienda y el recibo de pago 1199465 del 26 de abril de 1994. (Hecho estipulado).*

*7. El 4 de mayo de 1994, Ringling Bros. le solicitó al Departamento de Hacienda del Estado Libre Asociado, una vista informal para discutir la solicitud de reintegro de los $110,585.71 que se pagó por concepto de impuesto sobre los derechos de admisión a espectáculos públicos, cuyo pago lo realizó bajo protesta. Específicamente, Ringling Bros. sostuvo en su solicitud que entendía que cualificaba para la exención de espectáculos públicos teatrales o artísticos que consisten únicamente en la actuación de artistas en persona. (Hecho estipulado).*

*8. El 7 de junio de 1994, se celebró la vista informal solicitada por Ringling Bros. ante el Departamento de Hacienda, habiendo sido presidida por la Licenciada Waleska Aldebol. (Hecho estipulado).*

*9. Ringling Bros. compareció a través del CPA Jorge M. Cañellas, Director de Impuestos de la firma Ernst & Young; la Sra. María de los Ángeles Rivera, "Senior Manager" de Ernst & Young; el ex congresista de los Estados Unidos, Sr. Andy Ireland, Vicepresidente de Relaciones Gubernamentales de Ringling Bros.; la Sra. Sue Marcum, "Tax Manager" de Ringling Bros.; la Licenciada Joan Galvin, "Legislative Representative Government Relations" de Ringling Bros.; el Sr. Josantonio Mellado de FAMA Corporation; y el Lic. Gerardo A. Quirós López. (Hecho estipulado).*

*10. El 22 de diciembre de 1994, Ringling Bros. presentó demanda contra el Secretario de Hacienda por no acceder a su solicitud del reintegro del impuesto sobre el espectáculo público, pagado por presentaciones celebradas en 1994. El número del caso es el KCO 94-0030 (904). (Hecho estipulado).*

*11. Durante las presentaciones de los espectáculos públicos de 1995, 1996 y 1997, el Secretario de Hacienda le impuso y cobró bajo protesta de Ringling Bros. $180,686.31, $202,893.22 y $118,562.74 respectivamente por concepto de arbitrios sobre derechos a admisión a espectáculos públicos. (Hechos estipulados).*

*12. El 12 de junio de 1997, Ringling Bros. presentó por escrito dos solicitudes al Secretario de Hacienda, requiriendo el reintegro de los arbitrios sobre derechos de admisión a espectáculos públicos pagados bajo protesta para las funciones presentadas durante 1995 y 1996. El 11 de julio de 1997, solicitó el reintegro de 1997. (Hechos estipulados).*

*13. El 22 de julio de 1997 y el 12 de septiembre de 1997, Ringling Bros. le solicitó por escrito al Secretario de Hacienda que resolviera en definitiva las tres (3) solicitudes de reintegro. (Hecho estipulado).*

*14. El 28 de octubre de 1997, el demandado Secretario de Hacienda fue personalmente emplazado para entregarle una copia de una demanda jurada de mandamus para que resolviera las tres solicitudes de reintegro. (Hecho estipulado).*

*15. Para cada una de las presentaciones de Ringling Bros. correspondientes a los años 1995, 1996 y 1997, la parte demandante le sometió al Secretario de Hacienda -y previo a la presentación de cada uno de los espectáculos- que le concediera la exención del pago de los arbitrios a espectáculos públicos bajo las disposiciones de la ley que lo autorizan, si dichos espectáculos públicos son de naturaleza teatral o artísticos que comprenden únicamente la actuación de actores en persona. (Hecho estipulado).*

*16. El 5 de noviembre de 1997, la Secretaria de Hacienda denegó por escrito formal las tres solicitudes de reintegro de los arbitrios. (Hecho estipulado)."*

Así pues, el 22 de diciembre de 1994, Ringling presentó una demanda contra el Secretario impugnando la denegatoria de la exención solicitada, y en solicitud del reintegro de los arbitrios por ella satisfechos. Planteó que sus espectáculos estaban exentos del impuesto, ya que éstos eran espectáculos teatrales o artísticos de conformidad con el Artículo 4.004 (c) (10) de la Ley de Arbitrios de 1987, y su sucesor en el Código de Rentas Internas. El 18 de noviembre de 1997, Ringling presentó otra acción similar para reclamar el reintegro de los arbitrios que había satisfecho bajo protesta en relación con los espectáculos que había presentado durante los años 1995, 1996 y 1997. En éstas pagó en arbitrios las cantidades de $179,686.31, $202,893.22 y $118,562.74, respectivamente. Ringling solicitó, además, los intereses devengados a partir de las respectivas fechas de pago.

Los casos fueron consolidados y la vista en su fondo se celebró el 5, 6 y 19 de junio y el 10 de julio de 2000. Las partes presentaron prueba documental, objetiva y testifical, la que incluyó testimonio pericial de ambas partes.

Como ya indicamos, mediante la sentencia apelada, el TPI denegó los reintegros solicitados. Concluyó que Ringling no demostró que tenía derecho a la exención del pago de arbitrios, pues los espectáculos de patinaje sobre hielo que presentó no son espectáculos artísticos o teatrales.

En su recurso, Ringling plantea y discute que el TPI incidió de la siguiente forma:

*"1. Al formular la doctrina establecida en Puerto Rico sobre la interpretación restrictiva de la aplicación y concesión de las exenciones contributivas y su jurisprudencia interpretativa, de forma contraria a la clara intención legislativa.*

*2. Al apreciar y evaluar la suficiencia de la prueba y formular sus determinaciones de hechos, porque la evidencia no sostiene la conclusión de que los espectáculos de Ringling no son teatrales o artísticos y la apreciación no representa el balance más racional, justiciero y jurídico de la totalidad de la evidencia.*

*3. Al apreciar la prueba pericial de las partes que coincidieron en que los espectáculos presentados por Ringling son de naturaleza artística.*

*4. Al no atender su señalamiento en torno a que el Secretario aplica selectivamente las leyes fiscales puertorriqueñas.*

*5. Al no atender su señalamiento sobre el cambio de práctica administrativa del Secretario ni considerar*

*como reglamento su interpretación, aplicación y concesión de la exención del pago de arbitrios sobre los derechos de admisión a los espectáculos públicos de Ringling.*

*6. Al no aplicar en contra del Secretario la presunción de la Regla 16 de las de Evidencia, 32 L.P.R.A. Ap. IV, cuando se suprime voluntariamente evidencia, en relación al Programa del espectáculo presentado en Puerto Rico en el 1994 "Walt Disney's World on Ice-Mickey's Great Adventure", del cual no existe duplicado, que el Secretario extravió luego de que el mismo fuera sometido como evidencia por Ringling en la vista administrativa celebrada ante el Departamento de Hacienda."*

Por estar íntimamente relacionados, en primer término consideraremos conjuntamente los primeros 3 errores, pues giran en torno a la apreciación de la prueba desfilada ante el TPI y la interpretación del derecho aplicable a la controversia. ■

## II

### A

No existe controversia alguna que en sus demandas contra el Secretario, Ringling reclamó el reintegro de los arbitrios que satisfizo bajo protesta correspondiente a los años 1994 al 1997. A las correspondientes a los años 1994 y 1995, le aplican las disposiciones de la Ley de Arbitrios de 1987, y a la de los años 1996 al 1997, las disposiciones del Código de Rentas Internas. Veamos.

La Sección 4.001 de la Ley de Arbitrios de 1987, Ley Núm. 5 de 8 de octubre de 1987, 13 L.P.R.A. sec. 7151, fue incorporada en la Sección 2049 del Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 9049. Esta dispone lo siguiente:

*"Se impondrá, cobrará y pagará a los tipos establecidos en las secs. 7152 a 7156, inclusive, de este título, **un impuesto** sobre la venta al detal de joyería, la ocupación de habitaciones de hoteles, moteles, hoteles de apartamentos y casas de hospedaje, **sobre los derechos de admisión a espectáculos públicos**, sobre los premios obtenidos en pools, bancas, quinielas, dupletas, fondos de suscripción (subscription funds) o en cualquier otra jugada en los hipódromos de Puerto Rico y sobre los premios obtenidos en las carreras de caballo por los dueños de éstos.*

*El impuesto fijado sobre dichas transacciones se pagará en el tiempo y de la forma establecida en las secs. 7251 a 7266 de este título (Secciones 9068 a la 9084 del Código de Rentas Internas de 1994) y estará sujeto a las exenciones concedidas en dichas secciones."* (Énfasis suplido)

Igualmente, la Sección 4.004 de la Ley de Arbitrios de 1987, *supra*, sec. 7154, también incorporada en la Sección 2052 del Código de Rentas Internas de 1994, *supra*, sec. 9052, dispone lo siguiente:

*"Se impondrá, cobrará y pagará un impuesto de diez (10) por ciento **sobre los derechos de admisión a cualquier espectáculo público** que se celebre en Puerto Rico.*

*(a) Definiciones- A los fines de esta sección y de cualesquiera otras disposiciones de este subtítulo que sean de aplicabilidad, los siguientes términos tendrán el significado que a continuación se expresa:*

*(1) **"Espectáculo público" significará cualquier función, actividad o diversión que se celebre con el propósito de atraer la atención a la vista o a la contemplación intelectual para infundir en la persona deleite, admiración, asombro u otros efectos emotivos y por el cual se cobre un derecho o precio de admisión.***

*(a) "Derecho de admisión" significará el precio que fije el empresario al público para que éste pueda tener*

*acceso al espectáculo, antes de agregar el impuesto correspondiente.*

*(b) "Determinación del impuesto"*

*{...}*

*(c) **Exenciones** totales o parciales. Los siguientes espectáculos públicos estarán exentos, en todo o en parte, del impuesto fijado en esta sección:*

*{...}*

*(10) Los espectáculos teatrales o artísticos que consistan únicamente en la actuación de artistas en persona."* (Énfasis nuestro.)

Por último, el Artículo 4.004B(9) del Reglamento Núm. 3890 adoptado por el Secretario de Hacienda conforme la facultad que a esos efectos le confirió la Ley de Arbitrios de 1987, **Reglamento para la Administración y Aplicación de la Ley de Arbitrios del Estado Libre Asociado de Puerto Rico**, dispone también lo siguiente:

*"[...]*

*(9) **Espectáculos Teatrales o Artísticos que consistan únicamente en la actuación de artistas en personas, significará todo espectáculo llevado a cabo por el artista o artistas en persona en la presentación de tragedias, dramas, comedias, zarzuelas u obras de cualquier otro género literario; actuaciones de conferencias sobre temas literarios, artísticos, científicos, históricos o filósofos, actuaciones de declamadores, recitales musicales, coros, conciertos y operas.* "* (Énfasis nuestro.)

Como puede apreciarse de las disposiciones citadas, el derecho de admisión de los espectáculos públicos está sujeto a un impuesto de 10 por ciento, salvo que se traten de espectáculos teatrales o artísticos, en cuyo caso estarán exentos del impuesto.

Aunque los recursos se dan contra el dictamen y no contra los fundamentos, Ringling sostiene que es un error que amerita la revocación de la sentencia, que el TPI formulara erróneamente la doctrina vigente en Puerto Rico sobre la interpretación restrictiva de las exenciones contributivas. Postula que esa visión llevó al TPI a no considerar la naturaleza artística de los espectáculos públicos de Ringling. No estamos de acuerdo.

**B**

Es norma reiterada que cuando la ley es clara los tribunales están obligados a observar su letra. Los tribunales no tienen autoridad para añadirle limitaciones o restricciones que no aparecen en el texto de la ley. *Com. Pro Perm. Bda. Morales v. Alcalde*, **2002 J.T.S. 144**. Todas las leyes, aun las claras, requieren interpretación. Al hacerlo, el tribunal debe acudir primero al texto de la ley. Cuando éste es claro y libre de ambigüedad, no debe ser menospreciado bajo el pretexto de cumplir su espíritu. Ante un lenguaje inequívoco del Legislador, el texto de la ley es la expresión por excelencia de la intención legislativa. *Martínez v. A.C.A.A.*, **2002 J.T.S. 79**.

Ahora bien, el texto de la ley sólo puede ser ignorado cuando es claramente contrario al verdadero propósito legislativo. Es en esta instancia que los tribunales deben consultar el historial legislativo del estatuto objeto de interpretación judicial. *Pérez v. Mun. de Lares*, **2001 J.T.S. 163**.

Así, los tribunales están autorizados a interpretar las leyes cuando: (1) éstas no son claras o concluyentes sobre un punto particular, (2) cuando se trate de suplir una laguna, (3) cuando se trate de mitigar los efectos

adversos de aplicar una ley a una situación particular, y (4) cuando la justicia así lo requiere. *Alonso García v. S. L.G.,* **2001 J.T.S. 129**; *Pueblo v. Jesús Delgado,* **2002 J.T.S. 5**.

Respecto a los estatutos contributivos, es la función judicial interpretar los mismos en forma justa, a tenor con sus propios expresos términos, y **no en forma extensiva**. *Café Rico, Inc. v. Municipio de Mayagüez,* **2001 J.T.S. 152**; *Continental Insurance Company v. Srio. de Hacienda,* **2001 J.T.S. 71**; *Vélez et al. v. Bristol-Myers,* **2002 J.T.S. 129**.

Ciertamente, las exenciones tributarias, como gracias legislativas que constituyen, a su vez, derogaciones del poder soberano, no deben extenderse más allá de los términos expresados y exactos del estatuto que las otorga. Por ello, toda duda debe resolverse en contra de la existencia de la exención. *Lever Bros. Export Corp. v. Acevedo,* 140 D.P.R. 152 (1996). Véase, además, *Royal Bank v. Municipio de San Juan,* **2001 J.T.S. 95**; *Continental Insurance Company v. Srio. de Hacienda, supra; Director de Inspección Notarías v. Colón Muñoz,* 131 D.P.R. 102, 118 (1992); *Descartes Tes. v. Tribl. Contribuciones y Ortiz,* 73 D.P.R. 491, 497 (1952). El principio elemental del Derecho Tributario es que las deducciones, los créditos y los reintegros, por ser gracias legislativas al contribuyente, se interpretan restrictivamente contra aquél que las invoque como también lo hemos hecho aquí. *F.D.I.C. v. Mun. de San Juan,* 134 D.P.R. 385, 399 ((1993).

Al interpretar el Artículo 41 (c)(3) de la anterior Ley de Impuestos sobre Artículos de Uso y Consumo de Puerto Rico de 1956, 13 L.P.R.A. sec. 4041 (c)(3), similar a la sección 4.004 (c)(10) de la Ley de Arbitrios de 1987, *supra,* y a la Sección 2052 del Código de Rentas Internas de 1994, *supra,* que nos ocupa, el Tribunal Supremo de Puerto Rico indicó en *Ramos Cobián v. Secretario,* 85 D.P.R. 235 (1962) lo siguiente:

*"El propósito evidente de la legislatura fue el de estimular las actividades culturales en el país, eximiendo de tributo a los espectáculos públicos presentados por las instituciones de nivel universitario reconocidas por nuestras leyes, los celebrados por sociedades, agrupaciones y asociaciones de fines no pecuniarios, con más de 10 años de existencia, organizadas con el único propósito de fomentar la literatura y bellas artes y finalmente los espectáculos teatrales y artísticos. Estos espectáculos artísticos son aquéllos, que, congruente con la intención legislativa, tienden a fomentar la cultura del país, --desarrollo de la literatura o las bellas artes."*

En relación con la aprobación de la citada Ley de Impuestos, leemos del Diario de Sesiones de la Asamblea Legislativa, sesión del 6 de diciembre de 1955, Volumen VII, Fascículo 41, página 567:

*"Las disposiciones sobre espectáculos públicos fueron modificadas para fortalecer la exención de arbitrios que se concede a los espectáculos ofrecidos por la Universidad de Puerto Rico, y por sociedades, asociaciones y organizaciones dedicadas a fomentar la literatura y las bellas artes. Hemos creído que es conveniente y deseable estímulo a la actividad cultural el fomentar, mediante la liberación de carga contributiva, los espectáculos artísticos ofrecidos por artistas en persona cuando no formen parte de una exhibición cinematográfica o de otra índole."*

En la sentencia apelada, el TPI acogió sustancialmente esta doctrina de hermenéutica y la aplicó. No erró al así hacerlo. Contrario a lo que postula Ringling, el TPI si consideró su evidencia en torno a la naturaleza artística de los espectáculos públicos ofrecidos por Ringling, pero, como hemos indicado antes, concluyó que los espectáculos no tenían la naturaleza artística que fomenta la cultura del pais, el desarrollo de la literatura o las bellas artes. En otras palabras, concluyó que los espectáculos no constituían espectáculos teatrales o artísticos que conforme la ley están exentos del pago del impuesto sobre los derechos de admisión.

Atendido este extremo de los señalamientos antes indicados, procede que determinemos si la prueba presentada durante el juicio avalaba esa conclusión del TPI.

# III

## A

Como bien señaló el TPI, la controversia que le correspondía adjudicar era si los espectáculos de patinaje sobre hielo *"Walt Disney's World on Ice-Mickey's Great Adventure"* y *"Walt Disney's World on Ice-Beauty and The Beast"*, que Ringling presentó en Puerto Rico durante 1994 y 1995, respectivamente, y si los espectáculos de patinaje sobre hielo *"Walt Disney's World on Ice-Aladdin", "Walt Disney's World on Ice-Snow White and the Seven Dwarfs"*, que Ringling presentó en Puerto Rico durante 1996 y 1997 respectivamente, cualifican para que los derechos de admisión a esos espectáculos públicos estén exentos del pago de los arbitrios que la Ley de Arbitrios de Puerto Rico de 1987, y adoptada en el Código de Rentas Internas de 1994 le reconocen.

Durante el juicio, Ringling presentó los testimonios de la Sra. Judy Thomas, Directora de Talento y Coordinadora de Producción (Talent Director and Production Coordinator) para los espectáculos de Ringling, el Sr. David J. Thomas quien se desempeña como Gerente de Escenario (Stage Manager), Gerente de la Compañía (Company Manager), Contralor de Operaciones (Operations Comptroller) para la División de Espectáculos sobre Hielo y por último Vicepresidente de Ringling; el Sr. Jerry Bilik, Vicepresidente de Desarrollo Creativo de la Ringling; el Sr. Josantonio Mellado, Promotor de los Espectáculos de Ringling; el Sr. Jorge M. Cañellas Fidalgo, CPA, Abogado y socio de Ernst & Young, de quien Ringling es cliente, y como perito, la Dra. Gloria M. Vallejo Flores, Ph.D. con Maestría en estudios Hispánicos y estudios doctorales en Filosofía y Letras.

Por el Secretario testificaron el Dr. Edgar Quiles en calidad de perito, quien posee un Doctorado en Artes Teatrales de la Universidad de Michigan, y el Sr. Luis F. Rosario Cruz, quien fungió como Agente de Rentas Internas del Departamento de Hacienda y dirigió la Oficina de Servicios al Promotor de Espectáculos Públicos (OSPEP) de dicho departamento.

En lo pertinente al aspecto que atendemos ahora, el TPI formuló las siguientes determinaciones de hechos, que Ringling cuestiona:

*"17. Según la testigo Judith Thomas, para ser seleccionado para el proceso de audición de Ringling Bros., se necesitan destrezas de patinaje.*

*18. Las personas que son audicionadas se miden en función de su habilidad para patinar sobre hielo en unión a la destreza que tienen para demostrar o proyectar emoción, sea ésta de naturaleza cómica o de otra naturaleza. (Judith Thomas).*

*19. La función principal de un patinador en los espectáculos públicos de Ringling Bros. es poder proyectar el rol del personaje que está representando. Estas destrezas se adquieren por el entrenamiento con un profesor de actuación. (Judith Thomas).*

*20. Una vez la persona es seleccionada en la audición, pasa por un proceso de entrenamiento donde intervienen profesores de la actuación y de la fonética. (Judith Thomas).*

*21. Los espectáculos de Ringling Bros. están basados en una historia o un cuento alrededor del cual se produce el espectáculo público. (David Thomas).*

*22. En los espectáculos de Ringling Bros. se utilizan muchos efectos especiales para ayudar a transmitir la historia del cuento objeto del espectáculo. (David Thomas).*

*23. La música tiene que estar totalmente compaginada con el cuento objeto del espectáculo. (David Thomas).*

327

24. *Cada uno de los artistas, una vez forman parte del elenco de Ringling Bros., tiene que aprender a representar a un personaje. Esto debido a que los espectáculos se basan en la trama de un cuento. Estas destrezas se adquieren por el entrenamiento con un profesor de actuación. (Judith Thomas).*

25. *Los espectáculos son presentados con autorización y licencia otorgada por Disney Enterprises. Las voces son previamente aprobadas por Disney Enterprises para que sean consistentes con las voces universales de los personajes de Disney. (David Thomas).*

26. *El diálogo de los actores que se escucha, proviene de una cinta que contiene la grabación y que se difunde a través del sistema de altoparlantes, es decir, las voces que se oyen no son las de los patinadores. No obstante, los patinadores tienen que aprender el idioma en que se presenta cada uno de los espectáculos para poder adaptar los movimientos físicos con los movimientos de los labios para ir en coordinación con las estructuras de las oraciones del libreto. Es decir, los patinadores tienen que conocer el libreto en el idioma en que se presenta para poder ejecutar la representación de su personaje en particular. (Judith Thomas).*

27. *Se prepara un libreto o cuento de cómo se va a producir el espectáculo cuyo libreto es similar al de una producción teatral. (Jerry Bilik).*

28. *En los espectáculos hay una sección de asientos del público que está totalmente obstruida por el escenario. En este escenario también se coloca un parapeto para que bloquee cierta área que es por donde las personas entran y salen a trabajar en el espectáculo. (David Thomas).*

29. *En los espectáculos, la iluminación varía continuamente para crear el ambiente de la escena que se esté ejecutando. Se utilizan muchos efectos especiales para ayudar a transmitir la historia del cuento objeto del espectáculo público. (David Thomas).*

30. *El área o la superficie de hielo que sirve de escenario se reduce al mínimo para lograr que el público se pueda acercar lo más posible y sentarse alrededor del área del escenario. (David Thomas).*

31. *La música tiene que estar totalmente compaginada con el cuento y/o la historia que es objeto del espectáculo público. (David Thomas).*

32. *Los aplausos del público son grabados. (Jerry Bilik).*

33. *Según manifestado por el perito de la parte demandada, el Sr. Edgar Quiles, las Bellas Artes se componen de la música, la pintura, la escultura, la arquitectura, la danza, la literatura y el teatro.*

34. *El teatro es la síntesis de todas las Bellas Artes que en última instancia pretenden interpretar el fenómeno de la naturaleza.*

35. *Teatro es un espectáculo donde se produce la comunión, entre el actor y el espectador.*

36. *Los elementos subjetivizantes del teatro son el actor, el texto o mensaje y la comunión y empatía entre el actor y el público. La ausencia de uno de estos elementos, desvirtúa el teatro. Empatía es la absorción total de sentimientos.*

37. *Los elementos adjetivizantes del teatro son los adornos del teatro, como el vestuario, la escenografía, la iluminación, la utilería, la elección escénica, etc. Estos elementos adjetivizantes no son imprescindibles para el teatro.*

*38. En el teatro, el actor utiliza los elementos subjetivizantes en conjunción con los adjetivizantes para con su representación del texto lograr la comunión o empatía con el público.*

*39. La empatía es el objetivo del teatro. Para comunicar la empatía, el actor debe introducirse en el personaje como ente aparte, tiene que creerse que es ese personaje y entonces, a través de su voz entrenada, de los movimientos de su cuerpo entrenado, logrando mucha concentración, logra transmitir al público, los sentimientos de su personaje, a pesar de que el público conoce que el actor y el personaje no son la misma persona, porque sabe que está actuando. Los elementos necesarios para que se de la empatía entre el actor y la audiencia son la mirada, la manera de decir las cosas, la credibilidad y la retroalimentación de la audiencia con el actor.*

*40. En el teatro, el recurso básico es la voz. Cuando se da esa transmisión de sentimientos, ocurre el milagro actoral que al final el público premia con sus aplausos.*

*41. Los espectáculos de Ringling Bros. tienen elementos adjetivizantes teatrales no esenciales al teatro. El espectáculo visual de Ringling Bros. se acerca al teatro en su iluminación, el vestuario, las escenografías, pero la ejecución del patinador no es teatro. A diferencia del teatro, al espectáculo de Ringling Bros. se puede entrar tarde porque no se pierde continuidad.*

*42. En los espectáculos de Ringling Bros. no se da la comunicación de emoción entre el patinador y el espectador. El propósito de estos espectáculos es el puro entretenimiento."*

En síntesis, el TPI evaluó la prueba a base de las disposiciones de ley antes citadas, la definición de *"Espectáculos Teatrales o Artísticos"* consignada por el Secretario de Hacienda en el Reglamento 3890 del 16 de marzo de 1989, y la definición brindada por el Tribunal Supremo en el caso *Ramos Cobián, supra*. Entendió que los espectáculos no eran artísticos, pues no fomentaban una o alguna de las Bellas Artes o la cultura de nuestro pueblo.

Estimó que el cuento es un género de la literatura infantil, pero que la presentación de Mickey Mouse no pertenece a las obras clásicas de la literatura infantil. Más bien, el espectáculo gira en torno a un personaje creado en los estudios de Walt Disney.

Ciertamente, aceptó que los cuentos de Blanca Nieves, Aladino y la Bella y La Bestia son obras clásicas reconocidas de la literatura infantil; que estos libros e historias han sido escritos por autores de talla mundial como los hermanos Grimm y se han convertido en clásicos de la literatura infantil y que la totalidad de los anteriormente mencionados se han convertido en películas de largo metraje y en escena en teatros de Broadway.

Sin embargo, concluyó que para que un espectáculo basado en un cuento de la literatura infantil fomente la literatura, el enfoque de la presentación tendría que concentrarse en la historia o cuento y que, contrario a ello, los espectáculos de Ringling no fomentan la literatura porque en los espectáculos de patinaje sobre hielo la atracción principal es la habilidad técnica con la cual los patinadores ejecutan sus actos. Expuso que aunque las presentaciones de patinaje sobre hielo de Ringling contienen escenas musicales, baile y coreografía, Ringling no demostró que sus espectáculos sean recitales musicales, fomenten las bellas artes o la cultura de nuestro pueblo.

Por otro lado, concluyó que en las presentaciones de patinaje sobre hielo tampoco hay un acercamiento del hombre con la naturaleza. El público que asiste a los espectáculos no acude con el fin de ver una obra literaria, sino un espectáculo de patinaje. El propósito de los espectáculos de Ringling es el puro entretenimiento.

Concluyó que las presentaciones tampoco cumplen con la definición del Reglamento 3890 del Secretario de Hacienda, que dispone que los espectáculos teatrales o artísticos son llevados a cabo por el artista o artistas en

persona en la presentación de tragedias, dramas, comedias, zarzuelas u obras de cualquier otro género literario, actuaciones de conferencias sobre temas literarios, artísticos, científicos, históricos o filosóficos, actuaciones de declamadores, recitales musicales, coros, conciertos, y operas. Indicó que no cumplen con esta definición porque aunque hay artistas en persona, no son obras de género literario, ni son recitales musicales.

No consideró las presentaciones de patinaje sobre hielo como obras de teatro, debido a que estos espectáculos deleitan al público con los trucos, hazañas e imitaciones de los patinadores profesionales, con el disfraz de los personajes y no con la actuación dramática de los patinadores. A su juicio, de los espectáculos falta el elemento más importante del teatro: el actor.

Al observar los vídeos admitidos como evidencia de las presentaciones de Ringling, concluyó que de éste se desprende que no se da la comunicación de emoción entre el patinador y el espectador. No hay empatía entre el actor y el público, ya que las presentaciones consisten esencialmente de malabarismos, piruetas y movimiento de los patinadores. El público, más bien, se fija en los disfraces de los patinadores y sus movimientos, siendo la atracción mayor la habilidad técnica con la cual los patinadores ejecutan sus actos. Son, más bien, ejecuciones de atletas entrenados en la disciplina del patinaje.

En fin, concluyó que aunque los espectáculos de Ringling tienen elementos del teatro como la iluminación, el vestuario, la escenografía, entre otras, no son obras teatrales porque no contienen los tres elementos del teatro que son el actor, el mensaje y la empatía entre el actor y el público. No hay actores como tal, sino atletas que deleitan al público con sus actuaciones de patinaje. Es, más bien, un espectáculo visual cuyo propósito es el puro entretenimiento.

**B**

Una cuidadosa lectura de la transcripición y el examen de la prueba documental y objetiva presentada, demuestra que, ciertamente, Ringling ofreció prueba para tratar de justificar su reclamo. Presentó, sobretodo, prueba pericial, pero ésta no persuadió al juzgador de los hechos, como se puede apreciar de las determinaciones de hechos y el análisis del TPI antes expuesto.

Luego de analizar esa prueba, el TPI determinó que Ringling no había establecido que tuviese derecho a la exención que reclamaba. Como es conocido, es obligación del contribuyente demostrar real y efectivamente que es merecedor de la exención. Las exenciones contributivas no deben extenderse más allá de los términos expresos y exactos del estatuto que las otorga y toda duda debe resolverse en contra de la exención. *Esso Standard Oil v. A. P.P.R.*, 95 D.P.R. 772 (1968). De este modo, quien reclama el beneficio de la exención, debe establecer cumplidamente su derecho a la misma. Véase *Club Yaucano v. Secretario de Hacienda*, 83 D.P.R. 623, 629 (1961).

Como bien señala el Secretario, la Sra. Judith Thomas, Directora y Coordinadora de Producción de Ringling, admitió que las voces que se escuchan durante el espectáculo no son las de los patinadores; que las personas que trabajan en el espectáculo *"[e]n vez de estar patinando para un panel de jueces, ahora están patinando para un público. Es lo que se espera de los artistas que vienen a trabajar con nosotros.*

*El Sr. Jerry Bilik, Vicepresidente de Desarrollo Creativo de Ringling, así como Director, Autor y Director Musical de las producciones de Disney sobre el Hielo, admitió que no es lo normal que en una obra de teatro las voces sean grabadas.*

*El Sr. Josantonio Mellado Romero, promotor de espectáculos, declaró, por su parte, que desde 1987 representa a Ringling en los espectáculos de Disney sobre el Hielo celebrados en Puerto Rico, que en 1997 trajo a Puerto Rico el espectáculo "Looney Tunes on Ice",* parecido a los presentados por Ringling, pero perteneciente a otra compañía, cuyo espectáculo también pagó arbitrios.

La perito en literatura de Ringling, la Dra. Gloria María Vallejo Flores, quien fue contratada para examinar los espectáculos de Ringling a los fines de evaluar los elementos teatrales y artísticos, aceptó que la identificación del espectador con el actor es un elemento importante en la función teatral, porque, como señala el Secretario, si no hay actor, no hay representación teatral; que la formación del actor, su adiestramiento, vocación y destrezas, ya sean adquiridas por educación formal o a través de la experiencia, son partes indispensables de la ejecución para lograr el objetivo del teatro; que el actor requiere preparación académica actoral, experiencia, y vocación para recrear el teatro.

Según la transcripción, ésta fue confrontada con la prueba de que el 97% de los patinadores profesionales de Ringling no han tenido ningún tipo de formación académica o adiestramiento especializado sustantivo para poder llamarlos actores profesionales **y aceptó que desconocía dichos datos** al concluir en su informe que *"los actores evidenciaban de manera cabal que los estudios realizados en el campo histriónico son amplios y profundos"*.

La Dra. Vallejo, por su parte, admitió que ninguno de los actores de Ringling está acreditado por el Colegio de Actores de Puerto Rico y que no tienen ningún tipo de adiestramiento o formación académica formal en la representación teatral. Como señala el TPI en su nota al calce número dos, página 9 de la sentencia apelada, *"[e]l informe y testimonio de la Dra. Gloria Vallejo, por un lado, señaló que elementos como escenarios, vestuarios, iluminación y otros por sí sólos no son esenciales al teatro, aunque contribuyen a una mejor representación y por otro lado, concluyó que los espectáculos de patinaje sobre hielo de Ringling Bros. son teatro, porque reúnen elementos teatrales tales como la música, vestuario, iluminación, baile y movimiento corporal. Tales inconsistencias provocaron que el Tribunal le otorgara escaso valor probatorio a la perito de la parte demandante."*

El Secretario, por su parte, sentó a declarar al perito en teatro del Departamento de Hacienda, Dr. Edgar Quiles Ferrer. Este posee un doctorado en artes teatrales, funge como Director de Teatro, dirige la Sección del Teatro Experimental del Ateneo y es el Presidente de la Asociación de Críticos de Teatro de Puerto Rico.

El Dr. Quiles definió el arte teatral como la comunión de un público con un espectáculo viviente donde el actor va a ser la médula espinal de todo ese sentimiento. Señaló que la esencia del teatro es el actor, un intérprete, lo que implica una serie de emociones que continuamente se le están transmitiendo a un público que es el segundo elemento en términos de importancia del teatro, en el que el tercer elemento es lo que se le comunica, el mensaje, el texto y las ideas.

Indicó que a lo anterior se le añaden los elementos adjetivizantes que no son imprescindibles para el teatro, como el adorno, vestuario, escenografía, iluminación, utilería, elección escénica, y otros, los cuales tienen que estar en función a la figura central que es el actor. Para él, la empatía es esencial para el actor. Esta es la comunicación que va a lograr el espectador con el personaje, el actor, y que hace que el espectador se identifique con ese actor, creyéndose que ese actor es un personaje diferente a él. Declaró que eso provoca que el espectador se identifique totalmente con las emociones del personaje.

Para todo ello, resulta necesario que se tomen cursos de adiestramiento o se obtenga el conocimiento a través de la amplia experiencia. Declaró, además, que para desarrollar la empatía con el público resulta fundamental la voz, la manera en que se transmite con credibilidad, con naturalidad, siendo necesario el elemento de la acción humana, esto es, los sentimientos humanos puestos en escena. Indicó que la esencia del teatro no es divertir ni entretener, que quizás haya un carácter educativo, siendo el teatro para que la gente sienta, se comunique a través de sus sentimientos con ese otro personaje. El efecto de grabar todo el parlamento de una representación de un espectáculo, será que se rompe totalmente con el fenómeno de la empatía.

El Dr. Quiles añadió que la empatía es esencial para el actor; que es la comunicación que va a lograr el espectador con el personaje, el actor y que se identifique el espectador con el actor, al creer que ese actor es un

personaje diferente a él. Indicó que el recurso básico para representar un personaje es la voz, la cual hoy día se puede incluso representar a través de las mímicas. Señaló que es muy importante que el actor se compenetre con el personaje, se identifique con los sentimientos del personaje; que a través de todo ello es que se logra que el público perciba los sentimientos del personaje, que se crea que el actor se convirtió en el personaje.

Enfatizó la necesidad de que se tomen cursos de adiestramiento o se obtenga el conocimiento a través de la amplia experiencia. Declaró, además, que para desarrollar la empatía con el público resulta fundamental la voz, la manera en que se transmite con credibilidad, con naturalidad, siendo necesario el elemento de la acción humana, esto es, los sentimientos humanos puestos en escena. Indicó que la esencia del teatro no es divertir ni entretener, que quizás haya un carácter educativo, siendo el teatro para que la gente sienta, se comunique a través de sus sentimientos con ese otro personaje. En su opinión, grabar todo el parlamento de una representación de un espectáculo rompe totalmente con el fenómeno de la empatía.

Concluyó que al examinar los currículos de los patinadores se percató que no tienen experiencia ni estudios en teatro. Al evaluar los videos de los espectáculos, concluyó que no se trataba de teatro, ya que carece del actor y la naturaleza misma del patinaje impide que el patinador interprete a un actor y se compenetre con *"la esencia del actor"*.

Opinó que en los espectáculos de Ringling no se siente la presencia del actor; que el patinaje en éstos es más bien un deporte y no un arte, ni teatro; que los espectáculos de Ringling están dentro del campo del entretenimiento y no dentro del campo teatral. Si el espectador se pierde los primeros minutos, no se siente incómodo, contrario a lo que ocurre en el teatro.

En el informe pericial preparado por el Dr. Quiles, éste señaló que al observar los espectáculos de Ringling saltaba a la vista la ausencia de un intérprete dramático; que la actuación, fuerza motriz del arte teatral, quedaba sustituida por un virtuosísimo técnico de un deporte sofisticadísimo, como es el del patinaje sobre hielo. Expuso también que el patinador está divorciado en su entrenamiento de los instrumentos principales del actor (la voz y su expresión corporal para comunicar y transmitir sentimientos humanos), podría ejecutar su talento de una manera hermosa, sublime, impactante, maravillosa, impresionante, cautivadora a nuestros ojos, en fin, virtuosa, pero jamás se acercará al ente de la actuación; pues el mismo virtuosismo de su acto lo aleja totalmente de éste.

El Dr. Quiles opinó que el patinaje sobre hielo, o cualquier ejecución de cualquier tipo de deporte, por más hermosa que se haga, aunque se lleve a cabo sobre un escenario, donde la atracción mayor sea la habilidad técnica con que se ejecuta su acto de malabarismo, está totalmente divorciada del teatro; que el mantener el balance, la velocidad con que se deslizan sobre el hielo, sus grandes piruetas y ejecutorias, las composiciones corporales que tienen que asumir para ejecutar sus actos y acciones, hacen de los patinadores ser más artistas del circo que del teatro, pues nada más remoto a la naturalidad de las cosas de la vida que todo lo antes descrito.

De otra parte, el Sr. Luis F. Rosario Cruz, quien trabajó en la Oficina de Espectáculos Públicos del Departamento de Hacienda desde 1995 hasta que se retiró en el 1999, declaró que los espectáculos de Ringling se consideran tributables; que se tratan de espectáculos de patinaje sobre hielo, los cuales no están contemplados como exenciones; que lo que impacta en dichos espectáculos es el patinaje sobre hielo, lo cual no está cubierto por la exención. Señaló que antes habían oficinas regionales para determinar si los espectáculos eran o no tributables, y que luego del 1993 se centralizaron tales operaciones y se creó la Oficina de Servicios del Promotor de Espectáculos Públicos, para así uniformar las determinaciones con respecto a qué espectáculos eran tributables y cuáles no, así como existían diferencias en torno a los procedimientos internos.

Indicó que la posición del Departamento es que si se trata de algún evento de patinaje sobre hielo, el espectáculo será tributable, independientemente del tema que se escoja para vender el producto, ya que lo que impacta es el patinaje sobre el hielo y no el cuento. Añadió que existe otro promotor que trae espectáculos sobre

hielo, cuyos espectáculos también tributan.

Como puede observarse, una vez examinó la totalidad de la prueba desfilada y consideró la más creíble y persuasiva, el TPI tenía elementos suficientes para concluir como lo hizo.

## C

Aparte de carecer de elementos de juicio que justifiquen nuestra intervención con la apreciación de la prueba que evaluó el TPI, es norma reiterada que los tribunales apelativos no deben intervenir con la apreciación que de la prueba desfilada haya hecho el foro de instancia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Garriga Hijo, Inc. v. Cond. Marbella*, 143 D.P.R. 927 (1997); *Monllor v. Soc. de Gananciales*, 610 (1995); *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 400 (1994). La razón para ello es que el juzgador de hechos ve y observa el comportamiento de los que participaron en las vistas. Tiene la oportunidad de observar a los testigos al brindar sus testimonios, así como su comportamiento en la silla testifical.

## IV

Como cuarto y quinto error, Ringling alega que el TPI no atendió su planteamiento en torno a que como en 1994 el Secretario había cambiado la práctica administrativa que hasta 1993 había seguido de concederle a Ringling la exención que ahora le niega, y que incurrió en una conducta ilegal, arbitraria y caprichosa por ser selectiva que priva a Ringling de su propiedad sin el debido proceso de ley. No tiene razón. En otras palabras, cuestiona que el Secretario haya variado su interpretación de la exención en controversia y se la aplicara selectivamente a Ringling al negársela, pues esa exención le fue concedida a otros espectáculos que alega no cualificaban para ello, y que como previamente la interpretación del Secretario había sido a los efectos de que los espectáculos presentados por Ringling estaban exentos, al variarse tal norma, no se promulgó un nuevo reglamento.

Sobre la omisión del TPI, el planteamiento es frívolo. En la página 17 de la sentencia, página 18 del apéndice del recurso, el TPI expresó lo siguiente:

*"Por último, por el resultado a que hemos llegado no entraremos a considerar la alegación de la parte demandante de que la variación en 1994 de la práctica administrativa que el Secretario desplegó hasta 1993, fue ilegal, arbitraria y caprichosa privando a Ringling Bros. de su propiedad sin el debido proceso de ley. Baste decir que el derecho administrativo reconoce la facultad de las agencias en rectificar sus errores. Rivera v. ELA, 121 D.P.R. 582 (1988). Eso fue lo que hizo el Departamento de Hacienda al cambiar su práctica en 1994. Como es sabido, la exención se otorga de acuerdo a si el espectáculo cumple con la definición de la exención, no siendo su concesión automática. Es decir, el derecho a la exención es por el tipo de espectáculo que se presente y no por ser determinado organizador de los eventos."*

Aunque coincidimos con el Secretario en cuanto a que el hecho de que se le concediera tal exención a otro tipo de espectáculo no guarda pertinencia alguna a la controversia objeto del presente pleito, es obvio de la transcripción de la evidencia que uno de los propios testigos de Ringling, el Sr. Josantonio Mellado Romero, promotor de espectáculos, declaró que en 1997 trajo a Puerto Rico el espectáculo *"Looney Tunes on Ice"*, parecido a los presentados por Ringling, pero perteneciente a otra compañía y éste pagó los arbitrios que Ringling interesa se le exima de pagar. El Sr. Luis F. Rosario, ex director de la Oficina de Servicios del Promotor de Espectáculos Públicos del Departamento de Hacienda, también declaró que otro promotor que trae espectáculos sobre hielo tributa.

Finalmente, es norma en vigor que una parte no puede pretender ampararse en una actuación administrativa incorrecta o ilegal. *Director de Inspección de Notarías v. Colón*, 131 D.P.R. 102, 112 (1992); *Mariz v. Empresas Nativas*, 143 D.P.R. 63 (1997); *Santiago Declet v. Departamento de la Familia,* **2001 J.T.S. 8**. Un error de un organismo administrativo no obliga a éste ni impide su corrección. No se puede pretender, pues, que una

actuación administrativa de dudosa corrección, impida a la agencia pertinente que se corrija, optando por evitar su repetición. *Del Rey v. J.A.C.L.,* 107 D.P.R. 348 (1978).

Además, el Secretario de Hacienda puede en cualquier momento reformular una norma administrativa interpretativa de una ley, cuando dicha norma tiene el efecto de corregir o mejorar una anterior para conformarla más adecuadamente a la ley. *Banco Popular v. Mun. de Mayagüez,* 126 D.P.R. 653, 664 (1990).

Coincidimos con el Secretario, una vez más, cuando éste afirma que en casos de esta naturaleza, en que el interés público aparece seriamente afectado, no se puede aplicar el precepto legal de que nadie puede ir contra sus propios actos. El principio de derecho no puede aplicarse en las relaciones del ciudadano para con el Estado, cuando hay de por medio una cuestión de interés público que se interpone como barrera, en defensa de los derechos de la colectividad. *Infante v. Tribunal Examinador Médicos,* 84 D.P.R. 308, 316 (1961).

Al aplicar tales razonamientos al caso de autos, resulta forzoso concluir que no todas las actuaciones previas de la agencia no constituyen precedente vinculante para decisiones ulteriores sobre el mismo particular. No es permisible perpetuar ni convertir en práctica administrativa un error de derecho en la aplicación del mencionado reglamento. Reiteramos que un error administrativo no crea derechos ni impide su corrección, así como una parte no puede ampararse en una actuación administrativa patentemente incorrecta e ilegal.

## V

Al discutir el sexto señalamiento de error, Ringling sostiene que durante la vista administrativa celebrada ante el Departamento de Hacienda sometió un folleto del programa del espectáculo presentado en 1994, *"Mickey's Great Adventure"*, y que a pesar de que solicitó que el Secretario le devolviera el folleto, a la fecha del juicio no se le entregó, pues adujo que se había extraviado. Aunque no surge de la transcripción de la evidencia que Ringling formulara ese pedido durante el juicio, plantea que el TPI debió aplicar en contra del Secretario la presunción prescrita en la Regla 16 de las de Evidencia, *supra,* aduciendo que dicha evidencia hubiese sido perjudicial a dicha parte. No tiene razón.

Ciertamente, el inciso (5) de la Regla 16 dispone en lo pertinente que *"toda evidencia voluntariamente suprimida resultará adversa si se ofreciere"*. La propia regla, sin embargo, dispone que las presunciones enumeradas en ella son controvertibles y en esta causa no existe indicio de que el folleto haya sido **voluntariamente** suprimido, ya que el Secretario explicó que el folleto se le extravió.

No obstante, resulta obvio que Ringling tuvo la oportunidad de presentar prueba sobre el contenido del folleto si lo consideraba tan importante. La Regla 70 de la de Evidencia, 32 L.P.R.A. Ap. IV, provee lo siguiente:

*"Será admisible otra evidencia del contenido de un escrito, grabación o fotografía que no sea el original mismo cuando:*

*(a) El original se ha extraviado o ha sido destruido, a menos que el proponente lo haya perdido o destruido de mala fe.*

*(b) El original no puede ser obtenido por ningún procedimiento judicial disponible ni de ninguna otra manera.*

*(c) El original está en poder de la parte contra quien se ofrece y ésta no produce el original en la vista, a pesar de haber sido previamente advertida de que se necesitaría producirlo en la vista.*

*(d) El original no está íntimamente relacionado con las controversias esenciales y resultare inconveniente requerir su presentación."* (Énfasis nuestro.)

Finalmente y asumiendo que se cometió el error, éste no justifica la revocación de la sentencia apelada. Resulta evidente de la transcripción de evidencia que Ringling no estuvo impedida de presentar la abundante prueba que desfiló para probar el contenido del folleto mediante prueba testifical. Desfiló prueba sobre el contenido de sus espectáculos y, por consiguiente, del contenido del folleto extraviado a través de los testigos que sentó a declarar, incluyendo su perito.

## VI

Por los fundamentos antes expuestos, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2004 DTA 114

**1.** El 29 de abril de 2003, el Secretario presentó una moción de desestimación del recurso, aduciendo que Ringling había omitido del apéndice de su recurso una serie de documentos que el Secretario estimaba que eran esenciales para la adjudicación de la controversia. Mediante resolución emitida el 2 de mayo y notificada el 6 siguiente, denegamos esa moción de desestimación; ordenamos al TPI que elevara la prueba documental; aceptamos la transcripción sometida y requerimos al Secretario que presentara su alegato.

**2.** De rigor es consignar que el Secretario formuló otra moción de desestimación por el fundamento de que Ringling no sometió otros documentos en el apéndice. Realmente constituye una reconsideración de la negativa nuestra anterior a desestimar por el mismo motivo, aunque en esta segunda hizo referencia a otros documentos y citó jurisprudencia adicional. Como moción de reconsideración, la denegamos. Como nueva moción, también la denegamos, por estimar que la omisión de los documentos no impide que adjudiquemos los méritos del recurso.